409 F.2d 718, reversed and remanded.

BRENNAN, J., delivered the opinion of the Court, in which DOUGLAS, STEWART, WHITE, and MARSHALL, JJ., joined. HARLAN, J., filed an opinion concurring in the judgment, post, p. 398. BURGER, C. J., post, p. 411, BLACK, J., post, p. 427, and BLACKMUN, J., post, p. 430, filed dissenting opinions.

Stephen A. Grant argued the cause and filed a brief for petitioner.

Jerome Feit argued the cause for respondents. On the brief were Solicitor General Griswold, Assistant Attorney General Ruckelshaus, and Robert V. Zener.

Melvin L. Wulf filed a brief for the American Civil Liberties Union as amicus curiae urging reversal.

Page 403 U.S. 388, 389

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The Fourth Amendment provides that:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

In Bell v. Hood, 327 U.S. 678 (1946), we reserved the question whether violation of that command by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct. Today we hold that it does.

This case has its origin in an arrest and search carried out on the morning of November 26, 1965. Petitioner's complaint alleged that on that day respondents, agents of the Federal Bureau of Narcotics acting under claim of federal authority, entered his apartment and arrested him for alleged narcotics violations. The agents manacled petitioner in front of his wife and children, and threatened to arrest the entire family. They searched the apartment from stem to stern. Thereafter, petitioner was taken to the federal courthouse in Brooklyn, where he was interrogated, booked, and subjected to a visual strip search.

On July 7, 1967, petitioner brought suit in Federal District Court. In addition to the allegations above, his complaint asserted that the arrest and search were effected without a warrant, and that unreasonable force was employed in making the arrest; fairly read, it alleges as well that the arrest was made without probable cause. [Footnote 1] Petitioner claimed to have suffered great humiliation,

Page 403 U.S. 388, 390

embarrassment, and mental suffering as a result of the agents' unlawful conduct, and sought $15,000 damages from each of them. The District Court, on respondents' motion, dismissed the complaint on the ground, inter alia, that it failed to state a cause of action.[Footnote 2] 276 F. Supp. 12 (EDNY 1967). The Court of Appeals, one judge concurring specially,[Footnote 3] affirmed on that basis. 409 F.2d 718 (CA2 1969). We granted certiorari. 399 U.S. 905 (1970). We reverse.

I

Respondents do not argue that petitioner should be entirely without remedy for an unconstitutional invasion of his rights by federal agents. In respondents' view, however, the rights that petitioner asserts - primarily rights of

the search. This Court explicitly refused to inquire whether the warrant was "good under the state law . . . since in no event could it constitute the basis for a federal search and seizure." Id., at 29 (emphasis added).[Footnote 6] And our recent decisions regarding electronic surveillance have made it clear beyond peradventure that the Fourth Amendment is not tied to the

Page 403 U.S. 388, 394

niceties of local trespass laws. Katz v. United States, 389 U.S. 347 (1967); Berger v. New York, 388 U.S. 41 (1967); Silverman v. United States, 365 U.S. 505, 511 (1961). In light of these cases, respondents' argument that the Fourth Amendment serves only as a limitation on federal defenses to a state law claim, and not as an independent limitation upon the exercise of federal power, must be rejected.

Second. The interests protected by state laws regulating trespass and the invasion of privacy, and those protected by the Fourth Amendment's guarantee against unreasonable searches and seizures, may be inconsistent or even hostile. Thus, we may bar the door against an unwelcome private intruder, or call the police if he persists in seeking entrance. The availability of such alternative means for the protection of privacy may lead the State to restrict imposition of liability for any consequent trespass. A private citizen, asserting no authority other than his own, will not normally be liable in trespass if he demands, and is granted, admission to another's house. See W. Prosser, The Law of Torts 18, pp. 109-110 (3d ed. 1964); 1 F. Harper & F. James, The Law of Torts 1.11 (1956). But one who demands admission under a claim of federal authority stands in a far different position. Cf. Amos v. United States, 255 U.S. 313, 317 (1921). The mere invocation of federal power by a federal law enforcement official will normally render futile any attempt to resist an unlawful entry or arrest by resort to the local police; and a claim of authority to enter is likely to unlock the door as well. See Weeks v. United States, 232 U.S. 383, 386 (1914); Amos v. United States, supra.[Footnote 7] "In such cases there is no safety for the citizen,

Page 403 U.S. 388, 395

except in the protection of the judicial tribunals, for rights which have been invaded by the officers of the government, professing to act in its name. There remains to him but the alternative of resistance, which may amount to crime." United States v. Lee, 106 U.S. 196, 219 (1882).[Footnote 8] Nor is it adequate to answer that state law may take into account the different status of one clothed with the authority of the Federal Government. For just as state law may not authorize federal agents to violate the Fourth Amendment, Byars v. United States, supra; Weeks v. United States, supra; In re Ayers, 123 U.S. 443, 507 (1887), neither may state law undertake to limit the extent to which federal authority can be exercised. In re Neagle, 135 U.S. 1 (1890). The inevitable consequence of this dual limitation on state power is that the federal question becomes not merely a possible defense to the state law action, but an independent claim both necessary and sufficient to make out the plaintiff's cause of action. Cf. Boilermakers v. Hardeman, 401 U.S. 233, 241 (1971).

Third. That damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials should hardly seem a surprising proposition. Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty. See Nixon v. Condon, 286 U.S. 73 (1932);

Page 403 U.S. 388, 396

Nixon v. Herndon, 273 U.S. 536, 540 (1927); Swafford v. Templeton, 185 U.S. 487 (1902); Wiley v. Sinkler, 179 U.S. 58 (1900); J. Landynski, Search and Seizure and the Supreme Court 28 et seq. (1966); N. Lasson, History and Development of the Fourth Amendment to the United States Constitution 43 et seq. (1937); Katz, The Jurisprudence of Remedies: Constitutional Legality and the Law of Torts in Bell v. Hood, 117 U. Pa. L. Rev. 1, 8-33 (1968); cf. West v. Cabell, 153 U.S. 78 (1894); Lammon v. Feusier, 111 U.S. 17 (1884). Of course, the Fourth Amendment does not in so many words provide for its enforcement by an award of money damages for

Case 1:05-cv-01856-RJL   Document 16-2   Filed 03/02/2006   Page 3 of 24

Appeals reasoned that Barr v. Matteo, supra, did not "represen[t] the last word in this evolving area," 535 F.2d, at 691, because principles governing the immunity of officials of the Executive Branch had been elucidated in later decisions dealing with constitutional claims against state officials. E. g., Pierson v. Ray, 386 U.S. 547 (1967); Scheuer v. Rhodes, 416 U.S. 232 (1974); Wood v. Strickland, 420 U.S. 308 (1975). These opinions were understood to establish that officials of the Executive Branch exercising discretionary functions did not need the protection of an absolute immunity from suit, but only a qualified immunity based on good faith and reasonable grounds. The Court of Appeals rejected a proposed distinction between suits against state officials sued pursuant to 42 U.S.C. 1983 and suits against federal officials under the Constitution, noting that "[o]ther circuits have also concluded that the Supreme Court's development of official immunity doctrine in 1983 suits against state officials applies with equal force to federal officers sued on a cause of action derived directly from the Constitution, since both types of suits serve the same function of protecting citizens against violations of their constitutional rights by government officials." 535 F.2d, at 695 n. 7. The Court of Appeals recognized

Page 438 U.S. 478, 485

that under Imbler v. Pachtman, 424 U.S. 409 (1976), state prosecutors were entitled to absolute immunity from 1983 damages liability but reasoned that Agriculture Department officials performing analogous functions did not require such an immunity because their cases turned more on documentary proof than on the veracity of witnesses and because their work did not generally involve the same constraints of time and information present in criminal cases. 535 F.2d, at 696 n. 8. The court concluded that all of the defendants were "adequately protected by permitting them to avail themselves of the defense of qualified `good faith, reasonable grounds' immunity of the type approved by the Supreme Court in Scheuer and Wood." Id., at 696. After noting that summary judgment would be available to the defendants if there were no genuine factual issues for trial, the Court of Appeals remanded the case for further proceedings.

## II

The single submission by the United States on behalf of petitioners is that all of the federal officials sued in this case are absolutely immune from any liability for damages even if in the course of enforcing the relevant statutes they infringed respondent's constitutional rights and even if the violation was knowing and deliberate. Although the position is earnestly and ably presented by the United States, we are quite sure that it is unsound and consequently reject it.

In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the victim of an arrest and search claimed to be violative of the Fourth Amendment brought suit for damages against the responsible federal agents. Repeating the declaration in Marbury v. Madison, 1 Cranch 137, 163 (1803), that "'[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws,'" 403 U.S., at 397, and stating that "[h]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty," id., at 395, we rejected the claim

Page 438 U.S. 478, 486

that the plaintiff's remedy lay only in the state court under state law, with the Fourth Amendment operating merely to nullify a defense of federal authorization. We held that a violation of the Fourth Amendment by federal agents gives rise to a cause of action for damages consequent upon the unconstitutional conduct. Ibid. [Footnote 7]

Bivens established that compensable injury to a constitutionally protected interest could be vindicated by a suit for damages invoking the general federal-question jurisdiction of the federal courts,[Footnote 8] but we reserved the question whether the agents involved were "immune from liability by virtue of their official position," and remanded the case for that determination. On remand, the Court of Appeals for the Second Circuit, as has

But once this analysis is completed, there is no reason to return again to the absence of congressional authorization in resolving the question of immunity. Having determined that the plaintiff is entitled to a remedy in damages for a constitutional violation, the court then must address how best to reconcile the plaintiff's right to compensation with the need to protect the decisionmaking processes of an executive department. Since our decision in Scheuer was intended to guide the federal courts in resolving this tension in the myriad factual situations in which it might arise, we see no reason why it should not supply the governing principles for resolving this dilemma in the case of federal officials. The Court's opinion in Scheuer relied on precedents dealing with federal as well as state officials, analyzed the issue of executive immunity

Page 438 U.S. 478, 504

in terms of general policy considerations, and stated its conclusion, quoted supra, in the same universal terms. The analysis presented in that case cannot be limited to actions against state officials.

Accordingly, without congressional directions to the contrary, we deem it untenable to draw a distinction for purposes of immunity law between suits brought against state officials under 1983 and suits brought directly under the Constitution against federal officials. The 1983 action was provided to vindicate federal constitutional rights. That Congress decided, after the passage of the Fourteenth Amendment, to enact legislation specifically requiring state officials to respond in federal court for their failures to observe the constitutional limitations on their powers is hardly a reason for excusing their federal counterparts for the identical constitutional transgressions. To create a system in which the Bill of Rights monitors more closely the conduct of state officials than it does that of federal officials is to stand the constitutional design on its head.

## IV

As we have said, the decision in Bivens established that a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal-question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official. As Mr. Justice Harlan, concurring in the judgment, pointed out, the action for damages recognized in Bivens could be a vital means of providing redress for persons whose constitutional rights have been violated. The barrier of sovereign immunity is frequently impenetrable.[Footnote 31] Injunctive or declaratory relief is useless to a person who has already been injured. "For

Page 438 U.S. 478, 505

people in Bivens' shoes, it is damages or nothing." 403 U.S., at 410.

Our opinion in Bivens put aside the immunity question; but we could not have contemplated that immunity would be absolute.[Footnote 32] If, as the Government argues, all officials exercising discretion were exempt from personal liability, a suit under the Constitution could provide no redress to the injured citizen, nor would it in any degree deter federal officials from committing constitutional wrongs. Moreover, no compensation would be available from the Government, for the Tort Claims Act prohibits recovery for injuries stemming from discretionary acts, even when that discretion has been abused.[Footnote 33]

The extension of absolute immunity from damages liability to all federal executive officials would seriously erode the protection provided by basic constitutional guarantees. The broad authority possessed by these officials enables them to direct their subordinates to undertake a wide range of projects - including some which may infringe such important personal interests as liberty, property, and free speech. It makes

Page 438 U.S. 478, 506

actions in good faith.[Footnote 5]

Petitioner Butterfield also is alleged to have entered the conspiracy not later than May 1969. Employed as Deputy Assistance to the President and Deputy Chief of Staff to H. R. Haldeman,[Footnote 6] Butterfield circulated a White House memorandum in that month in which he claimed to have learned that Fitzgerald planned to "blow the whistle" on some "shoddy purchasing practices" by exposing these practices to public view.[Footnote 7] Fitzgerald characterizes this memorandum as evidence

Page 457 U.S. 800, 805

that Butterfield had commenced efforts to secure Fitzgerald's retaliatory dismissal. As evidence that Butterfield participated in the conspiracy to conceal his unlawful discharge and prevent his reemployment, Fitzgerald cites communications between Butterfield and Haldeman in December 1969 and January 1970. After the President had promised at a press conference to inquire into Fitzgerald's dismissal, Haldeman solicited Butterfield's recommendations. In a subsequent memorandum emphasizing the importance of "loyalty," Butterfield counseled against offering Fitzgerald another job in the administration at that time.[Footnote 8]

For his part, Butterfield denies that he was involved in any decision concerning Fitzgerald's employment status until Haldeman sought his advice in December 1969 - more than a month after Fitzgerald's termination had been scheduled and announced publicly by the Air Force. Butterfield states that he never communicated his views about Fitzgerald to any official of the Defense Department. He argues generally that nearly eight years of discovery have failed to turn up any evidence that he caused injury to Fitzgerald.[Footnote 9]

Together with their codefendant Richard Nixon, petitioners Harlow and Butterfield moved for summary judgment on February 12, 1980. In denying the motion the District Court upheld the legal sufficiency of Fitzgerald's Bivens (Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971)) claim under the First Amendment and his "inferred" statutory causes of action under 5 U.S.C. 7211 (1976 ed., Supp. IV) and 18 U.S.C. 1505.[Footnote 10] The court

Page 457 U.S. 800, 806

found that genuine issues of disputed fact remained for resolution at trial. It also ruled that petitioners were not entitled to absolute immunity. App. to Pet. for Cert. 1a-3a.

Independently of former President Nixon, petitioners invoked the collateral order doctrine and appealed the denial of their immunity defense to the Court of Appeals for the District of Columbia Circuit. The Court of Appeals dismissed the appeal without opinion. Id., at 11a-12a. Never having determined the immunity available to the senior aides and advisers of the President of the United States, we granted certiorari. 452 U.S. 959 (1981).[Footnote 11]

## II

As we reiterated today in Nixon v. Fitzgerald, ante, p. 731, our decisions consistently have held that government officials are entitled to some form of immunity from suits for damages. As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability.

Page 457 U.S. 800, 807

Our decisions have recognized immunity defenses of two kinds. For officials whose special functions or constitutional status requires complete protection from suit, we have recognized the defense of "absolute

## TAMPA BAY REVIEW

**Business & Law Since 1952**

Published Weekly
Clearwater, Pinellas County, Florida

COUNTY OF HILLSBOROUGH

S.S. 01-1420-ES003

STATE OF FLORIDA

Before the undersigned authority personally appeared _____ Matt Walsh
who on oath says that he is Publisher of the Tampa Bay Review, a weekly
newspaper published at Clearwater in Pinellas County, Florida; that the attached copy of
advertisement,

being a _____ Notice of Administration _____

in the matter of _____ Estate of Edwin L. Votolato _____

in the _____ Circuit _____ Court, was published in said newspaper in the

issues of _____ February 8, 15, 2002 _____

Affiant further says that the said Tampa Bay Review is a newspaper published
at Clearwater, Pinellas County, Florida, and that the said newspaper has heretofore been
continuously published and has been entered as second-class matter at the Post Office in
Clearwater in said Pinellas County, Florida, for a period of one year next preceding the first
publication of the attached copy of advertisement; and affiant further says that he has
neither paid nor promised any person, firm or corporation any discount, rebate, commission
or refund for the purpose of securing this advertisement for publication in said newspaper.

*Matt Walsh*
Matt Walsh

Sworn to and subscribed before me this

15th day of February A.D. 2002,
by Matt Walsh, who is personally known to me.

*Diana Campbell*

Diana Campbell    Notary Public, State of Florida
Diana Campbell    (SEAL)
My Commission CC687125
Expires December 4, 2003

FILED

02 FEB 15 PM 12: 21

*Karleen F. DeBlaker*
Karleen F. DeBlaker
Clerk Circuit County Court

NOTICE OF ADMINISTRATION
IN THE CIRCUIT COURT FOR
PINELLAS COUNTY, FLORIDA
PROBATE DIVISION
File Number: 01-1420-ES003
IN RE: ESTATE OF
EDWIN L. VOTOLATO,
Deceased.

The ancillary administration of the
estate of Edwin L. Votolato, deceased,
File Number 01-1420-ES003, is pending
in the Circuit Court for Pinellas
County, Florida, Probate Division, the
address of which is 315 Court Street,
Clearwater, Florida 33756. The names
and addresses of the personal repre-
sentative and the personal representa-
tive's attorney are set forth below.
ALL INTERESTED PERSONS ARE
NOTIFIED THAT:
All persons upon whom this notice is
served who have objections that chal-
lenge the validity of the will, the qualifi-
cations of the personal representative,
venue, or jurisdiction of this Court are
required to file their objections with
this Court WITHIN THE LATER OF
THREE MONTHS AFTER THE DATE
OF THE FIRST PUBLICATION OF
THIS NOTICE OR THIRTY DAYS
AFTER THE DATE OF SERVICE OF A
COPY OF THIS NOTICE ON THEM.
All creditors of the decedent and
other persons having claims or
demands against decedent's estate on
whom a copy of this notice is served
within three months after the date of
the first publication of this notice must
file their claims with this Court WITH-
IN THE LATER OF THREE MONTHS
AFTER THE DATE OF THE FIRST
PUBLICATION OF THIS NOTICE OR
THIRTY DAYS AFTER THE DATE OF
SERVICE OF A COPY OF THIS
NOTICE ON THEM.
All other creditors of the decedent
and persons having claims or demands
against the decedent's estate must file
their claims with this Court WITHIN
THREE MONTHS AFTER THE DATE
OF THE FIRST PUBLICATION OF
THIS NOTICE.
ALL CLAIMS, DEMANDS AND
OBJECTIONS NOT SO FILED WILL
BE FOREVER BARRED.
The date of the first publication of
this Notice is February 8, 2002.
Personal Representative:
ELDA D. VOTOLATO
490 Angell Road,
Lincoln, RI 02865
Attorney for Personal Representative:
ARTHUR J. LEONARD, Attorney for
Ancillary Personal Representative
Florida Bar No. 869340
SALTER McGOWAN SYLVIA &
LEONARD, INC.
321 South Main Street, Suite 301
Providence, RI 02903
Telephone: (401) 274-0300
February 8, 15, 2002          02-0914

Close Window

## Map Details

**Votolato, Ernest P DDS**
266 Wayland Ave
Providence, RI 02906
401-751-8046





Powered by **MAPQUEST**

© 2005 MapQuest.com, Inc. All Rights Reserved. Use Subject to License/Copyright
© 2004 Digital City, Inc. All Rights Reserved. Privacy Policy & Legal Notices

Send to Printer    Close Window

Yahoo! Yellow Pages - D'Amico, Peter P - D'Amico & Testa    Page 8 of 24    Page 1 of 2

Case 1:05-cv-00356-RJL    Document 16-2    Filed 03/02/2006



Yahoo!   My Yahoo!   Mail    Make Yahoo! your home page

Search the Web

**YAHOO!** LOCAL
Yellow Pages

**Sign In**
New User? Sign Up

Yellow Pag






Find Your Graduating Class

I graduated in

classmates.com

# Yahoo! Yellow Pages

**Your Search:** [        ]  [Search]
Search by Category or Business Name (e.g. Hotel or Holiday Inn)

**Location:** ★ North Pro

**Top** > **Legal and Financial** > **Law Firms** > **All Services**

## D'Amico, Peter P - D'Amico & Testa
Address:  194 Waterman St, Providence, RI 02906
Phone:   (401) 273-4400

 Email this Business L

Save to Yahoo! Addre

**Related Categories**
This listing appears in:

• Law Firms > All Services
• Law Firms > Personal Injury
• Law Firms > Corporate
• Law Firms > Criminal
• Law Firms > DUI
• Law Firms > Insurance
• Law Firms > Real Estate

**Related Searches**

•    Attorneys

**Maps and Directions**

Interactive Map | Driving Directions



More Searc
Search the Web fo

D'Amico, Pete
D'Amico & Tes
Providence, RI

**Businesses Cl**
194 Waterman St,
Providence, RI 02S

• Restaurants
• Golf Courses
• Department Store
• Entertainment &
• Hotels
• Change to this lo

Business Information provided by InfoUSA ®, Omaha, Nebraska Copyright © 2006.
All Rights Reserved. Use Subject to License.

Driving Directions - Local - Maps - Real Estate - Yellow Pages



# Thomas J. D'Amico



Extended Bio | Publications

Thomas D'Amico is a partner in the Intellectual Property Group of Dickstein Shapiro Morin & Oshinsky LLP. Since 1974, Mr. D'Amico has concentrated in the areas of patent, trademark, copyright, and computer law, including litigation, licensing, and acquisition of rights. He is licensed to practice before the U.S. Patent and Trademark Office (USPTO) and various federal and state courts.

**Partner**
2101 L Street, NW
Washington, DC
20037-1526
T: (202) 828-2232

DAmicoT@dsmo.com

📧 Download V-Card

**Related Practices**

→ Intellectual Property

**Bar Admissions**
District of Columbia
Virginia
U.S. District Court for the District of Columbia
U.S. District Court for the Eastern District of Virginia
U.S. Court of Appeals for the Federal Circuit
U.S. Patent and Trademark Office

**Education**
Washington University in St. Louis, B.S., 1969
The George Washington University Law School, J.D., 1974



# Bio: I. Lewis 'Scooter' Libby

Bio: I. Lewis 'Scooter' Libby

Bio: I. Lewis 'Scooter' Libby   **Bio: I. Lewis 'Scooter' Libby**



Vice President Dick Cheney, right, and senior White House staff members, from right, Deputy Chief of Staff Harriet Miers, Chief of Staff to the Vice President I. Lewis "Scooter" Libby, Counselor to the President Dan Bartlett and Deputy Chief of Staff Karl Rove are seen in the Rose Garden of the White House in Washington in this July 1, 2005 file photo. Vice presidential adviser Libby was indicted Friday, Oct. 28, 2005, on charges of obstruction of justice, making a false statement and perjury in the CIA leak case. (AP Photo/Charles Dharapak, File)

**By The**

**Oct 28, 2005 (AP)**— NAME I. Lewis "Scooter" Libby, Jr.

AGE-BIRTH DATE 55, Aug 22, 1950.

EDUCATION B.A., Yale University, 1972; J.D., Columbia University, 1975.

EXPERIENCE Assistant to the President, chief of staff to the Vice President and national security affairs adviser to the Vice President, 2001 to 2005; Adviser to Vice President Dick Cheney in the 2000 presidential campaign, 2000; lawyer, Dechert, Price & Rhoads, 1995-2001; deputy under secretary-policy, U.S. Defense Department, 1992-1995; deputy undersecretary-strategy and resources, U.S. Department of Defense, 1989-1992; lawyer, Dickstein, Shapiro & Morin, 1985-1989; special projects director, State Department's Bureau of East Asian and Pacific Affairs, 1982 - 1985; member, policy planning staff, State Department, 1981-1982.

FAMILY Married to Harriet Grant, 2 children.

*Copyright 2006 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.*

- Print This StoryPrint This Story
- E-mail This ArticleEmail This Article
- RSS Headlines

# Scooter Libby

From Wikipedia, the free encyclopedia
(Redirected from Lewis Libby)
You have new messages (diff). 

>  **This article documents a current event.**
> Information may change rapidly as the event progresses.

**I. Lewis "Scooter" Libby Jr.** (born August 22, 1950) is the former Chief of
Staff and assistant for National Security Affairs to U.S. Vice President Dick
Cheney and presidential advisor. Republican strategist Mary Matalin, a
former counselor to Cheney and a friend of Libby, describes him as someone
who did "for the vice president what the vice president does for the president.
He's exceedingly analytical, detailed, strategic, bright; and he's discreet."[1]
(http://en.wikipedia.org/wiki/Scooter_Libby#endnote_matalin)

On October 28, 2005, Libby resigned his government position, hours after
being indicted by a grand jury.

On January 6, 2006, the Hudson Institute announced that Libby had joined
that organization as a senior advisor, with a focus on "issues relating to the
War on Terror and the future of Asia. He also will offer research guidance
and will advise the institute in strategic planning."

I. Lewis Libby

## Contents

- 1 Career
- 2 The Plame affair, Libby, and Judith Miller
- 3 Indictment and resignation
- 4 Personal
- 5 Trivia
- 6 External links
- 7 References

# Career

Libby was born into a Jewish family in New Haven, Connecticut, and raised in Florida. After graduating from
Andover, an exclusive New England boarding school, Libby graduated from Yale University in 1972, where one
of his professors was Paul Wolfowitz. Libby received his Juris Doctor (J.D.) degree from Columbia University
Law School in 1975.

After graduating Columbia Law School, Libby practiced law in Philadelphia.

Libby first entered government service in the United States Department of State in 1981, as a member of the
Policy Planning Staff in the Office of the Secretary. From 1982 to 1985 he served in that department as director of
special projects in the Bureau of East Asian and Pacific Affairs. During the George H. W. Bush administration
(1989-1993), Libby served in the United States Department of Defense as principal deputy under secretary
(Strategy and Resources), and later was confirmed by the U.S. Senate as deputy under secretary of defense for
policy. Libby co-authored the draft of the "Defense Planning Guidance" with Wolfowitz for the then-Defense

# AnyWho
online directory
**AT&T**

## Advanced People Search

Powered by
Intelius

First Name [            ]   Last Name [            ]   State [      ]   Search

**AT&T Ca**
Phone servi

Finding People, Places,
and Businesses

**HOME    YELLOW PAGES    WHITE PAGES    REVERSE LOOKUP    HEL**

❯ International
❯ Maps
❯ Area Codes
❯ Toll-Free

❯ Credit Center
❯ Shopping.com
❯ eHarmony.com
❯ eDiets.com

**LowerMyBills**
Get a $160,000
Mortgage for Under
$785/Month

**Quicken Loans**
Get a $200,000 loan for
$875 a month.

**Coolsavings**
Free Samples & Coupons
For all your needs

**Classmates.com**
Find old friends and
reconnect with them!

**Reunion.com**
Find Anyone's Email
Address

**Prospect411**
Search for new
customers in your area!

PRIVACY
BBBOnLine

Google WEB SEARCH [                    ] 🔘 GO

## FIND A PERSON

| Last Name *Required* | First Name | Street |
|---|---|---|
| donegan | thomas | [            ] |
| TIP: Try the 1st 4 letters | TIP: Try just the 1st letter | TIP: Don't include St, Ave, etc |

| City | State | Zip | |
|---|---|---|---|
| [      ] | CT ▾ | [      ] | 🔍 SEARCH |

**You searched for: thomas donegan in CT**
**Results 1 - 2 of 2**    ◀ PREVIOUS ¦ NEXT ▶
**Residential Listings**

**Donegan, Thomas**
   15 Smith Pl                                        203-250-7169
   Cheshire, CT 06410
   Maps & Directions | Did you go to school with Thomas Donegan?
   More Info on Thomas Donegan. Free Preview!
   ❊ Find a Nearby Business

**Donegan, Thomas D**
   2945 Huntington Rd                                 203-377-8745
   Trumbull, CT 06611
   Maps & Directions | Did you go to school with Thomas D Donegan?
   More Info on Thomas D Donegan. Free Preview!
   ❊ Find a Nearby Business

◀ PREVIOUS ¦ NEXT ▶

View Email Results for thomas donegan

## SPONSORED LINKS

❯ Automate Reverse Lookups          ❯ Find Anyone's Email
❯ Research Your Family Tree         ❯ Get Your Home's Value
❯ Get your Free Credit Report       ❯ Find a great job in your area
❯ View Homes for Sale Nationwide    ❯ Get Away with Hotels.com
❯ Find your Soul Mate               ❯ Send an eCard to someone

Adver

**Public
Resou**

**Advan
People**

**First Na**
[            ]

**Last Na**
[            ]

**City**
[            ]

**State**
Select

Searc

**Other R**

❯ Bac
Che

❯ Inst
Che

❯ Pro
Che

❯ Co
Scr

Powered
1.800.US

Home  |  About AnyWho  |  Help  |  AT&T Worldnet Service

Terms and Conditions.  AT&T Privacy Policy.
Copyright 2006 AT&T Corp. All Rights Reserved.

Department of Health • Vital Statistics
# STATE OF FLORIDA
# MARRIAGE RECORD
TYPE IN UPPER CASE
USE BLACK INK
This license not valid unless seal of Clerk,
Circuit or County Court, appears thereon.

(STATE FILE NUMBER)

1009078

(APPLICATION NUMBER)

JF    03/22/2000    BK 300 PG    64
KARLEEN F. DE BLAKER, CLERK

## APPLICATION TO MARRY

| | | | |
|---|---|---|---|
| 1. GROOM'S NAME *(First, Middle, Last)* | | | 2. DATE OF BIRTH *(Month, Day, Year)* |
| THOMAS D DONEGAN | | | 03/30/1942 |
| 3a. RESIDENCE - CITY, TOWN, OR LOCATION | 3b. COUNTY | 3c. STATE | 4. BIRTHPLACE *(State or Foreign Country)* |
| CLEARWATER | PINELLAS | FL | CONNECTICUT |
| 5a. BRIDE'S NAME *(First, Middle, Last)* | | 5b. MAIDEN SURNAME *(If different)* | 6. DATE OF BIRTH *(Month, Day, Year)* |
| LINDA S PIZZURRO | | | 12/15/1952 |
| 7a. RESIDENCE - CITY, TOWN, OR LOCATION | 7b. COUNTY | 7c. STATE | 8. BIRTHPLACE *(State or Foreign Country)* |
| CLEARWATER | PINELLAS | FL | NEW YORK |

WE THE APPLICANTS NAMED IN THIS CERTIFICATE, EACH FOR HIMSELF OR HERSELF, STATE THAT THE INFORMATION PROVIDED ON THIS RECORD IS CORRECT TO THE BEST OF OUR KNOWLEDGE AND BELIEF, THAT NO LEGAL OBJECTION TO THE MARRIAGE NOR THE ISSUANCE OF A LICENSE TO AUTHORIZE THE SAME IS KNOWN TO US AND HEREBY APPLY FOR LICENSE TO MARRY.

SEAL

| | |
|---|---|
| 9. SIGNATURE OF GROOM *(Sign full name using black ink)* | 10. SUBSCRIBED AND SWORN TO BEFORE ME ON (DATE) |
|  | 03/03/2000 |
| 11. TITLE OF OFFICIAL | 12. SIGNATURE OF OFFICIAL *(Use black ink)* |
| DEPUTY CLERK | Yvonne M Wright |
| 13. SIGNATURE OF BRIDE *(Sign full name using black ink)* | 14. SUBSCRIBED AND SWORN TO BEFORE ME ON (DATE) |
| Linda S. Pizzurro | 03/03/2000 |
| 15. TITLE OF OFFICIAL | 16. SIGNATURE OF OFFICIAL *(Use black ink)* |
| DEPUTY CLERK | Yvonne M Wright |

## LICENSE TO MARRY

AUTHORIZATION AND LICENSE IS HEREBY GIVEN TO ANY PERSON DULY AUTHORIZED BY THE LAWS OF THE STATE OF FLORIDA TO PERFORM A MARRIAGE CEREMONY WITHIN THE STATE OF FLORIDA AND TO SOLEMNIZE THE MARRIAGE OF THE ABOVE NAMED PERSONS. THIS LICENSE MUST BE USED ON OR AFTER THE EFFECTIVE DATE AND ON OR BEFORE THE EXPIRATION DATE IN THE STATE OF FLORIDA IN ORDER TO BE RECORDED AND VALID.

SEAL

| 17. COUNTY ISSUING LICENSE | 18. DATE LICENSE ISSUED | 18a. DATE LICENSE EFFECTIVE | 19. EXPIRATION DATE |
|---|---|---|---|
| PINELLAS | 03/03/2000 | 03/06/2000 | 05/05/2000 |
| 20a. SIGNATURE OF COUNTY CLERK OR JUDGE | 20b. TITLE | | 20c. BY D.C. |
| Karleen F. De Blaker | CLERK OF CIRCUIT COURT | | ymw |

## CERTIFICATE OF MARRIAGE

I HEREBY CERTIFY THAT THE ABOVE NAMED GROOM AND BRIDE WERE JOINED BY ME IN MARRIAGE IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA.

| 21. DATE OF MARRIAGE *(Month, Day, Year)* | 22. CITY, TOWN, OR LOCATION OF MARRIAGE | |
|---|---|---|
| 3/17/2000 | CLEARWATER | |
| 23a. SIGNATURE OF PERSON PERFORMING CEREMONY *(Use black ink)* | 23c. ADDRESS *(Of person performing ceremony)* | 3365 |
|  | 2300 WHITMAN ST CLWTR FL | |
| 23b. NAME AND TITLE OF PERSON PERFORMING CEREMONY *(Type or print)* | 24. SIGNATURE OF WITNESS TO CEREMONY *(Use black ink)* | |
| EILEEN G SPIVEY NOTARY PUBLIC | David S Spivell | |
| | 25. SIGNATURE OF WITNESS TO CEREMONY *(Use black ink)* | |

EILEEN G. SPIVEY
NOTARY PUBLIC, STATE
MY COMMISSION EXP.
AUGUST 6, 2001
#CC 842425

INFORMATION BELOW FOR USE BY VITAL STATISTICS ONLY - NOT TO BE RECORDED

**Section 3**

**Vehicle**

| DRIVER ACTION | 1 Phantom 2 Hit & Run 3 N/A | 03 | YEAR | 99 | MAKE | FORD | TYPE | 03 | USE | 01 | VEH. LICENSE NUMBER | A11CCG | STATE | FL | VEHICLE IDENTIFICATION NUMBER | 1FMZU32E2XUB16272 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

TRAILER OR TOWED VEHICLE INFORMATION — TRAILER TYPE

VEHICLE TRAVELING [N] [S] [E] [W]   **FLORIDA AVE.**   ON   AT   Est. MPH 10   Posted Speed 45   EST. VEHICLE DAMAGE $200   1 Disabling 2 Functional 3 No Damage 02   EST. TRAILER DAMAGE 0   SHOW FIRST POINT OF VEHICLE DAMAGE AND DIRECT DAMAGE AREAS 12

MOTOR VEHICLE INSURANCE COMPANY (LIABILITY OR PIP): **PROGRESSIVE INS. CO.**   POLICY NUMBER **35254501-4**   VEHICLE REMOVED BY: **DRIVER**   1 Tow Rotation List / 3 Driver   2 Tow Owner's Request / 4 Other 03

NAME OF VEHICLE OWNER (Check Box If Same As Driver) [X]   CURRENT ADDRESS (Number and Street)   CITY AND STATE   ZIP CODE

NAME OF OWNER (Trailer or Towed Vehicle)   CURRENT ADDRESS (Number and Street)   CITY AND STATE   ZIP CODE

NAME OF MOTOR CARRIER (Commercial vehicle Only)   CURRENT ADDRESS (Number and Street)   CITY, STATE AND ZIP CODE   US DOT or ICC/MC IDENTIFICATION NUMBERS

**Pedestrian**

NAME OF DRIVER (take From Driver License) / PEDESTRIAN **JOAN PIZZURRO**   CURRENT ADDRESS (Number and Street) **4804 FOXSHIRE CR**   CITY & STATE / ZIP CODE **TAMPA   FL   33624**   DATE OF BIRTH **06/30/54**

DRIVER LICENSE NUMBER **P260480547300**   STATE FL   DL TYPE 05   REQ. END 03   ALC/DRUG TEST TYPE 1 Blood 3 Urine 5 None 2 Breath 4 Refused 05   RESULTS N/A   ALC/DRUG/PHYS. DEF. 01   RES 01   RACE 1   SEX 01   INJ. 02   S. EQUIP. 05   EJECT. 01

HAZARDOUS MATERIALS BEING TRANSPORTED 1 Yes 2 No [2]   PLACARDED 1 Yes 2 No [2]   WAS HAZARDOUS MATERIAL SPILLED? 1 Yes 2 No [2]   RECOMMEND DRIVER RE-EXAM IF YES EXPLAIN IN NARRATIVE 1 Yes 2 No [2]   DRIVER'S PHONE NO. UK

# 1 PROPERTY DAMAGED - OTHER THAN VEHICLES   EST. AMOUNT $   OWNER'S NAME   ADDRESS   CITY   STATE   ZIP

# 2 PROPERTY DAMAGED - OTHER THAN VEHICLES   EST. AMOUNT $   OWNER'S NAME   ADDRESS   CITY   STATE   ZIP

**CONTRIBUTING CAUSES - DRIVER / PEDESTRIAN**

| | 1 | 2 | 3 |
|---|---|---|---|
| 01 No Improper Driving / Action | | | |
| 02 Careless Driving (Explain in Narrative) | 11 | 01 | 01 |
| 03 Failed to Yield Right-of-Way | | | |
| 04 Improper Backing | | | |
| 05 Improper Lane Change | | | |
| 06 Improper Turn | | | |
| 07 Alcohol-Under Influence | | | |
| 08 Drugs-Under Influence | | | |
| 09 Alcohol & Drugs-Under Influence | | | |
| 10 Followed Too Closely | | | |
| 11 Disregarded Traffic Signal | | | |
| 12 Exceeded Safe Speed Limit | | | |
| 13 Disregarded Stop Sign | | | |
| 14 Failed to Maintain Equip. / Vehicle | | | |
| 15 Improper Passing | | | |
| 16 Drove Left of Center | | | |
| 17 Exceeded Stated Speed Limit | | | |
| 18 Obstructing Traffic | | | |

18 Improper Load / 19 Disregarded Other Traffic Control / 20 Driving Wrong Side / Way / 21 Fleeing Police / 23 Vehicle Modified / 24 Driver Distraction (Explain in Narrative) / 77 All Other (Explain in Narrative)

**VEHICLE DEFECTS**

| | 1 | 2 | 3 |
|---|---|---|---|
| 01 No Defects | 01 | 01 | 01 |
| 02 Def. Brakes | | | |
| 03 Worn / Smooth Tires | | | |
| 04 Defective / Improper Lights | | | |
| 05 Puncture / Blowout | | | |
| 06 Steering Mech. | | | |
| 07 Windshield Wipers | | | |
| 08 Equipment / Vehicle | | | |
| 77 All Other (Explain in Narrative) | | | |

**POINT OF COLLISION**

| | 1 | 2 | 3 |
|---|---|---|---|
| 01 On Road | 01 | 01 | 01 |
| 02 Not On Road | | | |

WORK AREA: 01 None / 02 Nearby / 03 Entered — 01 01 01

**VEHICLE MOVEMENT**

| | 1 | 2 | 3 |
|---|---|---|---|
| 01 Straight Ahead | 01 | 03 | 03 |
| 02 Slowing / Stopped / Stalled | | | |
| 03 Making Left Turn | | | |
| 04 Backing | | | |
| 05 Making Right Turn | | | |
| 06 Changing Lanes | | | |
| 07 Entering / Leaving Parking Space | | | |
| 08 Properly Parked | | | |
| 09 Improperly Parked | | | |
| 10 Making U-Turn | | | |

11 Passing / 12 Driverless or Runaway Vehicle / 77 All Other (Explain in Narrative)

**PEDESTRIAN ACTION**

| | 1 | 2 | 3 |
|---|---|---|---|

01 Crossing Not at Intersection / 02 Crossing at Mid-block Crosswalk / 03 Crossing at Intersection / 04 Walking Along Road With Traffic / 05 Walking Along Road Against Traffic / 06 Working on Vehicle in Road / 67 Working in Road / 68 Standing/Playing in Road / 69 Standing in Pedestrian Island / 77 All Other (Explain in Narrative)

**VEHICLE SPECIAL FUNCTIONS**

| | 1 | 2 | 3 |
|---|---|---|---|
| 01 None | 1 | 1 | 1 |
| 02 Farm | | | |
| 03 Police Pursuit | | | |
| 04 Recreational | | | |
| 05 Emergency Operation | | | |
| 06 Construction / Maintenance | | | |

**SOURCE OF CARRIER INFORMATION**

| | 1 | 2 | 3 |
|---|---|---|---|
| 01 Not Applicable | 1 | 1 | 1 |
| 02 Shipping Papers | | | |
| 03 Vehicle Side | | | |
| 04 Driver | | | |
| 05 Other | | | |

**FIRST / SUBSEQUENT HARMFUL EVENT(S)**

01 Collision with MV in Transport (Rear End) / 02 Collision with MV in Transport (Head-on) / 03 Collision with MV in Transport (Angle) / 04 Collision with MV in Transport (Left Turn) / 05 Collision with MV in Transport (Right Turn) / 06 Collision with MV in Transport (Sideswipe) / 07 Collision with MV in Transport (Backed Into) / 08 Collision with Parked Car / 09 Collision with MV on Other Roadway / 10 Collision with Pedestrian / 11 Collision with Bicycle / 12 Collision with Bicycle (Bike Lane) / 13 Collision with Moped / 14 Collision with Train / 15 Collision with Animal / 16 MV Hit Sign / Sign Post / 17 MV Hit Utility Pole / Light Pole / 18 MV Hit Guardrail / 19 MV Hit Fence / 20 MV Hit Concrete Barrier Wall / 21 MV Hit Bridge / Pier / Abutment / Rail / 22 MV Hit Tree / Shrubbery / 23 MV Hit Construction Barricade Sign / 24 Collision with Traffic Gate / 25 Collision with Crash Attenuators / 26 Collision with Fixed Object Above Road / 27 MV Hit Other Fixed Object / 28 Collision with Moveable Object on Road

| | 1 | 2 | 3 |
|---|---|---|---|
| | 04 | 04 | |

29 MV Ran Into Ditch / Culvert / 30 Ran Off Road / Into Water / 31 Overturned / 32 Occupant Fell From Vehicle / 33 Tractor / Trailer Jackknifed / 34 Fire / 35 Explosion / 36 Downhill Runaway / 37 Cargo Loss or Shift / 38 Separation of Units / 39 Median Crossover / 77 All Other (Explain in Narrative)

**ROAD SYSTEM IDENTIFIER**

| | | |
|---|---|---|
| 01 Interstate | 07 Forest Road | 04 |
| 02 U.S. | 08 Private Roadway | |
| 03 State | 77 All Other (Explain in Narrative) | |
| 04 County | | |
| 05 Local | | |
| 06 Turnpike / Toll | | |

**ROAD SURFACE / CONDITION**

| | | |
|---|---|---|
| 01 Dry | | 01 |
| 02 Wet | | |
| 03 Slippery | | |
| 04 Icy | | |
| 77 All Other (Explain in Narrative) | | |

**WEATHER**

| | | |
|---|---|---|
| 01 Clear | | 02 |
| 02 Cloudy | | |
| 03 Rain | | |
| 04 Fog | | |
| 77 All Other (Explain in Narrative) | | |

**LIGHTING CONDITION**

| | |
|---|---|
| 01 Daylight | 01 |
| 02 Dusk | |
| 03 Dawn | |
| 04 Dark (Street Light) | |
| 05 Dark (No Street Light) | |
| 88 Unknown | |

**ROAD SURFACE TYPE**

| | |
|---|---|
| 01 Slag / Gravel / Stone | 02 |
| 02 Blacktop | |
| 03 Brick / Block | |
| 04 Concrete | |
| 05 Dirt | |
| 77 All Other (Explain in Narrative) | |

**ROAD CONDITIONS AT TIME OF CRASH**

| | |
|---|---|
| 01 No Defects | 01 |
| 02 Obstruction With Warning | |
| 03 Obstruction Without Warning | |
| 04 Road Under Repair / Construction | |
| 05 Loose Surface Materials | |
| 06 Shoulders - Soft / Low / High | |
| 07 Holes / Ruts / Unsafe Paved Edges | |
| 08 Standing Water | |
| 09 Worn / Polished Road Surface | |
| 77 All Other (Explain in Narrative) | |

**VISION OBSTRUCTED**

| | |
|---|---|
| 01 Vision Not Obscured | 01 |
| 02 Inclement Weather | |
| 03 Parked / Stopped Vehicle | |
| 04 Trees / Crops / Bushes | |
| 05 Load on Vehicle | |
| 06 Building / Fixed Object | |
| 07 Signs / Billboards | |
| 08 Fog | |
| 09 Smoke 77 All Other (Explain in Narrative) | |
| 10 Glare | |

**TRAFFIC CONTROL**

| | |
|---|---|
| 01 No Control | 05 |
| 02 Special Speed Zone | |
| 03 Speed Control Sign | |
| 04 School Zone | |
| 05 Traffic Signal | |
| 06 Stop Sign | |
| 07 Yield Sign | |
| 08 Flashing Light | |
| 09 Railroad Signal | |
| 10 Officer / Guard / Flagman | |

11 No U-Turn / 12 No Passing Zone / 77 All Other (Explain in Narrative)

**SITE LOCATION**

| | |
|---|---|
| 01 Not At Intersection / RR Xing / Bridge | 02 |
| 02 At Intersection | |
| 03 Influenced by Intersection | |
| 04 Driveway Access | |
| 05 Railroad | |
| 06 Bridge | |
| 07 Entrance Ramp | |
| 08 Exit Ramp | |
| 09 Parking Lot - Public | |
| 10 Parking Lot - Private | |

11 Private Property / 12 Toll Booth / 13 Public Bus Stop Zone / 77 All Other (Explain in Narrative)

**TRAFFICWAY CHARACTER**

| | |
|---|---|
| 1. Straight-Level | 1 |
| 2. Straight-Upgrade / Downgrade | |
| 3. Curve-Level | |
| 4. Curve-Upgrade / Downgrade | |

**TYPE SHOULDER**

| | |
|---|---|
| 1. Paved | 3 |
| 2. Unpaved | |
| 3. Curb | |

**LOCATION TYPE**

| | 1 | 2 | 3 |
|---|---|---|---|
| 1 Primarily Business | | | |
| 2 Primarily Residential | | | |
| 3 Open Country | | | |

**Violator(s)**

| SECTION # | NAME OF VIOLATOR (s) | FL STATUTE NUMBER | CHARGE | CITATION NUMBER |
|---|---|---|---|---|
| 1 | BRANDI SPAHR | 316.075(1)c | FAILURE TO STOP FOR TRAFFIC SIGNAL | 9717-BYC |



Exhibit # 32

**NT-59**
APPLICATION NO. **95-20352**

**MARRIAGE RECORD**
**FLORIDA**

| | | | | | |
|---|---|---|---|---|---|
| **GROOM DATA** | 1. GROOM'S NAME First, Middle, Last **DANIEL LEE HEINIG** | | | 2. DATE OF BIRTH (Month, Day, Year) **AUGUST 20, 1958** | |
| | 3A. RESIDENCE - CITY, TOWN, OR LOCATION **TAMPA** | 3B. COUNTY **HILLSBOROUGH** | 3C. STATE **FLORIDA** | 4. BIRTHPLACE (State or Foreign Country) **PENNSYLVANIA** | |
| **BRIDE DATA** | 5A. BRIDE'S NAME First, Middle, Last **JANET DEBORAH PEREIRA** | | | 6. MAIDEN SURNAME (of others) | 6. DATE OF BIRTH (Month, Day, Year) **OCTOBER 6, 1968** |
| | 7A. RESIDENCE - CITY, TOWN, OR LOCATION **TAMPA** | 7B. COUNTY **HILLSBOROUGH** | 7C. STATE **FLORIDA** | 8. BIRTHPLACE (State or Foreign Country) **COLOMBIA** | |

**APPLICATION TO MARRY**

WE, THE APPLICANTS NAMED IN THIS CERTIFICATE, EACH FOR HIMSELF, STATE THAT THE INFORMATION PROVIDED ON THIS RECORD IS CORRECT TO THE BEST OF OUR KNOWLEDGE AND BELIEF, THAT NO LEGAL OBJECTION TO THE MARRIAGE NOR THE ISSUANCE OF A LICENSE TO AUTHORIZE THE SAME IS KNOWN TO US AND HEREBY APPLY FOR LICENSE TO MARRY.

**AFFIDAVIT OF BRIDE AND GROOM**

9. GROOM'S SIGNATURE (Sign full name) _[signature]_

12. BRIDE'S SIGNATURE (Sign full name) _[signature]_

10. SUBSCRIBED AND SWORN TO **MARCH 9, 1995**
11. TITLE OF ISSUING OFFICER **DEPUTY CLERK**

13. SUBSCRIBED AND SWORN TO ME ON: **MARCH 9, 1995**
14. SIGNATURE OF ISSUING OFFICER _[signature]_

**LICENSE TO MARRY**

17. DATE LICENSE ISSUED **MARCH 9, 1995**
18. EXPIRATION DATE **MAY 7, 1995**

ISSUED ON OR BEFORE THE ABOVE EXPIRATION IN ORDER TO BE RECORDED AND

SIGNATURE OF DEPUTY CLERK _[signature]_

19A. D.C. **194**

**CERTIFICATE OF MARRIAGE**

21. I HEREBY CERTIFY THAT THE ABOVE NAMED WERE JOINED IN MARRIAGE IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA

ON **Mar 11 95** AT **Orlando** CITY OR TOWN, FLORIDA

22A. SIGNATURE OF PERSON PERFORMING CEREMONY _[signature]_

22B. NAME OF PERSON PERFORMING CEREMONY (Type or Print) **John Rosenblatt**

22C. TITLE **Rabbi**

22D. ADDRESS _[illegible]_

23. SIGNATURE OF WITNESS _[signature]_

24. SIGNATURE OF WITNESS _[signature]_

**RECORDED**

25. COUNTY **HILLSBOROUGH**
26. DATE RECORDED **MAR 22 1995**
27. CLERK OF COURT **RICHARD L AKE** BY _[signature]_

BOOK **505** PAGE **178**

INFORMATION BELOW WILL NOT APPEAR ON CERTIFICATION ISSUED BY VITAL STATISTICS, EXCEPT UPON REQUEST.

| | | | | | |
|---|---|---|---|---|---|
| **GROOM** | 28. RACE **WHITE** | 29. NUMBER OF THIS MARRIAGE **1** | 30. LAST MARRIAGE ENDED BY DEATH, DIVORCE OR ANNULMENT | 31. DATE LAST MARRIAGE ENDED | |
| **BRIDE** | 32. RACE **HISPANIC** | 33. NUMBER OF THIS MARRIAGE **1** | 34. LAST MARRIAGE ENDED BY DEATH, DIVORCE OR ANNULMENT | 35. DATE LAST MARRIAGE ENDED | |

HRS Form 743, Feb 91

This license not valid unless seal of Clerk, Circuit or County Court, appears thereon.

AUDIT CONTROL NO. **833787**

Certified Copy

to the S boundary of said Tract "A", a
distance of 140.46'; thence N 0°02'36" E
310.12'; thence N. 89°58'12" E 140.46 to
the POINT OF BEGINNING.  TOGETHER WITH 15'
Easement reserved for ingress or egress and
for drainage and/or utilities purposes.

A portion of TRACT "A" of the Anclote River
Acres, Unit Three, as recorded in Plat
Book 4 page 70 of the Public Records of
Pasco County, Florida; FOR A POINT OF
REFERENCE commence at the NE corner of said
Tract "A" run thence W along the N boundary
of Tract "A", a distance of 1,410.90';
thence S 0°02'36" W along a line parallel
to the E boundary of said Tract "A", a
distance of 312.0'; thence S 89°58'12" W,
140.46' to the POINT OF BEGINNING; thence S
0°02'36" W, 15.0'; thence S 89°58'12" W,
239.92' to the SW right-of-way line of
River Drive; thence on a curve to the left
with a radius of 395.0' and arc of 16.97',
a chord of 16.97' and a chord bearing N
27°52'24" E along said right-of-way line;
thence N 89°58'12" E, 232.0' to the POINT
OF BEGINNING.

located in Pasco County, Florida, was sold to STATE STREET BANK

AND TRUST COMPANY, TRUSTEE FOR EMC TRUST 2, SERIES 1993-L2

BONDHOLDERS, whose address is 222 West Las Colinas Boulevard,

#600, Irving, Texas  75039.

WITNESS my hand and the seal of this court on this __14__ day

of June, 1995.

JED PITTMAN
Clerk of the County Court

By: _Rosalie Johnson_
Deputy Clerk

UNKNOWN HEIRS/DEVISEES OF MICHAEL S. PEREIRA, deceased,

their successors and assigns, TERESA PEREIRA, CHESTER PEREIRA,

LOUISE PEREIRA, ROBERT PEREIRA, ARTIFICIAL KIDNEY CENTER OF RHODE

ISLAND, WACO WATER CO., f/k/a H2O WATER CO., INC., d/b/a AQUA PURE,

and NATALIE COOPER, AS TENANT,

the long
haul," Mr. Bush said. "All of us have been partners in a great
enterprise. And
even some of the youngest understand that we are living in historic
times. Last
month, a girl in Lincoln, Rhode Island, sent me a letter. It began,
'Dear George
W. Bush: If there is anything you know, I, Ashley Pearson, age 10, ca
do to
help anyone, please send me a letter and tell me what I can do to sav
our
country.' She added this P.S. 'If you can send a letter to the troops
please
put, 'Ashley Pearson believes in you.' "

Ashley stared at the screen as the president of the United States sai
her name.
Her father reached over, tugged her shoulder and said "Good job, Ash.
Even her
sleepy 9-year-old brother, Mark, looked alert.

"Oh my God," her mom said, covering her mouth as tears welled up in h
eyes.
The president stumbled on Ashley's age but quickly corrected himself
and
continued.

"Tonight, Ashley, your message to our troops has just been conveyed.
And yes,
you have some duties yourself. Study hard in school, listen to your m
and dad,
help someone in need, and when you and your friends see a man or woma
in
uniform, say 'thank you.' And while you do your part, all of us here
this
great chamber will do our best to keep you and the rest of America sa
and
free."

As the president finished, Natalie Pearson stared at her daughter and
then gave
her a long kiss on the cheek.

Ashley summed up the experience succinctly.

"It's pretty cool."

* * *

* WHITE HOUSE CORRESPONDENT: Ashley Pearson, right, with her mother,
Natalie,
listen to President Bush describe Ashley's letter to him during last
night's
State of the Union address.

JOURNAL PHOTO / GLENN OSMUNDSON

* RED-LETTER DAY: Ashley Pearson, 10, talks with a reporter as she
watches

Attachment No. 14(a)



### Florida Department of
# HIGHWAY SAFETY & MOTOR VEHICLES
*Making Highways Safe*



# Florida Highway Patrol
A Nationally Accredited Law Enforcement Agency



**MAJOR
THOMAS M. KNIGHT ,
TROOP COMMANDER**

**Brooksville District**

**Lakeland District**

**Pinellas Park District**

**Tampa District**

**Florida Highway Patrol Auxiliary**

**Troop C Public Affairs Office**

**Photo Gallery**

**Troop C Live Traffic Reports**

# Welcome to Troop C's Cyber Headquarters

From the Sunshine Skyway Bridge to the Crystal River Nuclear Power Plant, Troop C covers over 5,500 square miles of the Sunshine State. The seven counties that comprise Troop C are home to world renowned sports teams, attractions, beaches, lakes, and an annual climate that makes it easy to see why we are the world's playground! While traveling through Troop C, please know that we are just a phone call away. Dial *FHP on your cellular phone to report a crash, aggressive or impaired driver, or a disabled motorist. Thank you for visiting us and making us Florida's premier law enforcement agency.

---

**Return to Troop News Home Page**

**DO NOT WRITE IN THIS SPACE**

PATROL
NARRATIVE / DIAGRAM
OF HIGHWAY SAFETY & MOTOR VEHICLES
TRAFFIC CRASH RECORDS
TALLAHASSEE, FLORIDA 32399-0500

| DATE OF CRASH | COUNTY / CITY CODE | INVEST. AGENCY REPORT NUMBER | HSMV CRASH REPORT NUMBER |
|---|---|---|---|
| 06/12/2003 | 03 / 00 | FHPC030FF000437 | 70177765 |

FIED FATALITIES ONLY) | TIME EMS ARRIVED (FATALITIES ONLY)

(NARRATIVE)

VEHICLE-1(SECTION-1) WAS TRAVELING EASTBOUND ON CR 582A(FLETCHER AVE) IN THE LEFT LANE.VEHICLE-2(SECTION-2) AND VEHICLE-3 (SECTION-3) WERE TRAVELING NORTHBOUND ON FLORIDA AVE ATTEMPTING A LEFT TURN ONTO CR582A TO TRAVEL WESTBOUND. DRIVER-1(SECTION-1) FAILED TO OBSERVE A RED TRAFFIC SIGNAL INDICATING A STOPPED TRAFFIC CONDITION. VEHICLE-1 STRUCK ITS FRONT TO THE LEFT SIDE OF VEHICLE-2. DUE TO THIS IMPACT VEHICLE-1 WAS PUSHED RIGHT STRUCKING ITS FRONT A SECOND TIME THE THE LEFT SIDE OF VEHICLE-3. VEHICLE-1 AND VEHICLE-2 WERE AT FINAL REST UPON THIS TROOPERS ARRIVAL.

| | PASS# | PASSENGER'S NAME | CURRENT ADDRESS | CITY & STATE | ZIP CODE | DATE OF BIRTH | RACE | SEX | LOC | INJ | S. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 03/25/72 | 1 | 2 | 05 | 01 | 0 |
| | | | | 37917 | | 05/03/93 | 1 | 2 | 04 | 01 | |
| 01 | PASS# | ANGELA MALLONEE | 410 E. OK    KNOXVILLE    TN | 37917 | | 10/09/72 | 1 | 1 | 03 | 01 | |
| 02 | PASS# | JESSICA JINKS | 410 E. OK    KNOXVILLE    TN | 37917 | | | | | | | |
| 03 | PASS# | FRANKIE JINKS | 410 E. OK    KNOXVILLE    TN | | | | | | | | |
| | PASS# | PASSENGER'S NAME | CURRENT ADDRESS | CITY & STATE | ZIP CODE | DATE OF BIRTH | | | | | |
| | PASS# | PASSENGER'S NAME | CURRENT ADDRESS | CITY & STATE | ZIP CODE | | | | | | |
| | PASS# | PASSENGER'S NAME | CURRENT ADDRESS | | | | | | | CITATION NU | |
| | PASS# | PASSENGER'S NAME | | FL STATUTE NUMBER | CHARGE | | | | | CITATION N. | |

| SECTION # | NAME | | FL STATUTE NUMBER | CHARGE | |
|---|---|---|---|---|---|

| SECTION # | NAME | | | CURRENT ADDRESS | CITY & STATE |
|---|---|---|---|---|---|
| | | | | | WITNESS NAME (2) HARRISON C HAUSWALD 13805 SUPREME PLACE TAMPA FL |

NESS NAME (1)
UIS A PORCARO 8119 N ORLEANS AVE TAMPA FL 33604

CURRENT ADDRESS | CITY & STATE | ZIP CODE | BY- NAME:

INJURED TAKEN TO:

1 Physician or Nurse    4 Certified 1st Aider
2 Paramedic or EMT    5 Other
3 Police Officer

ST AID GIVEN BY (NAME) | IF NO, THEN WHY? | DATE OF REPORT 06/12/2003 | PHOTOS TAKEN? 1 YES  2 NO | [2] | FHP

IS INVESTIGATION COMPLETE? 1 YES  2 NO | [1]

STIGATION 1 YES [1]
E AT SCENE 2 NO

| ID / BADGE NUMBER | DEPARTMENT |
|---|---|
| 2101/1528 | FLORIDA HIGHWAY PATROL |

STIGATOR - RANK & SIGNATURE
WELLS    TROOPER    Page 3 of 4 Pages

IF YES, BY
1 INVE
2 OTH

[X]